FOR YOUR INFORMATION

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0434p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

PAUL SCARBROUGH,

    *Plaintiff-Appellant,*

v.

MORGAN COUNTY BOARD OF EDUCATION, Perry Spurling, Individually, Randy Harlan, Individually, Deborah Lively, Individually, and Conrad Strand, Individually,

    *Defendants-Appellees.*

No. 04-6302

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 01-00198—Thomas W. Phillips, District Judge.

Argued: October 25, 2005

Decided and Filed: November 22, 2006

Before: SILER and CLAY, Circuit Judges; CARR, Chief District Judge.*

---

## COUNSEL

**ARGUED:** Peter Alliman, WHITE, CARSON & ALLIMAN, Madisonville, Tennessee, for Appellant. John C. Duffy, Knoxville, Tennessee, for Appellees. **ON BRIEF:** Peter Alliman, WHITE, CARSON & ALLIMAN, Madisonville, Tennessee, Benjamin S. Pressnell, PRESSNELL & HARRELL, Tazewell, Tennessee, for Appellant. John C. Duffy, Knoxville, Tennessee, for Appellees.

---

## OPINION

---

    SILER, Circuit Judge. Plaintiff Paul Scarbrough, the former elected school superintendent for Morgan County, Tennessee, was not appointed to the new position as the Director of Schools for the county system following the publication of a newspaper article which announced that he would be the featured speaker at a convention sponsored by a church with a predominantly homosexual

---

    *The Honorable James G. Carr, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

1

congregation. He sued the Morgan County Board of Education and some of its individual members under several constitutional rights, including freedom of speech, freedom of association, free exercise of religion, and equal protection of the law. The district court dismissed the case, finding that inasmuch as Scarbrough had not gone to the convention or spoken in the church, he had no First Amendment right to protect. We **AFFIRM** in part and **REVERSE** and **REMAND** in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1996, Scarbrough was elected superintendent of Morgan County Schools. The position of elected school superintendent expired by law in Tennessee on August 31, 2000; the new law provided for appointment of a Director of Schools – who would perform the same duties as the superintendent – by the local board of education. The Morgan County Board of Education enlisted the aid of the Tennessee School Boards' Association (TSBA) to prepare for the search and interview process for a new school Director. Five candidates were selected by the TSBA for the Board's consideration. Scarbrough and David Freels, then-assistant superintendent of Morgan County Schools, were among these five candidates.

In March or April 2000, a friend approached Scarbrough and asked him to say a prayer at a convention breakfast being hosted by the Metropolitan Community Church of Knoxville (Metro). Scarbrough was unaware at the time that Metro had a predominantly gay and lesbian congregation. He initially agreed to the request, but later realized he had a scheduling conflict and notified his friend that he would be unable to attend. The friend then asked Scarbrough to speak at the convention, which Scarbrough agreed to consider. Ultimately he was unable to accept the invitation and so declined.

On May 13, 2000, the Knoxville News-Sentinel newspaper published an article announcing – incorrectly – that Scarbrough, the Morgan County Superintendent, would be a speaker at the Metro-sponsored convention. The article further stated that Metro was a predominantly gay and lesbian Christian church. However, Scarbrough had declined the speaking engagement after Metro supplied the information to the News-Sentinel. Thereafter, Scarbrough provided written statements to two local newspapers explaining the inaccuracies in the News-Sentinel article. The published statements maintained that Scarbrough had declined the speaking engagement and further noted that he did not endorse, uphold, or understand homosexuality, but that he would not refuse to associate with gay people or refuse the opportunity to share with them his beliefs.

After the News-Sentinel article ran, Board members Perry Spurling, Conrad Strand, and Debra Lively received complaints from Morgan County constituents critical of Scarbrough's agreement to speak at the Metro convention. Some constituents expressed the concern that Scarbrough should not be appointed Director of Schools. Spurling, Strand, Lively, and Randy Harlan became concerned that Scarbrough was putting the school's "stamp of approval" on homosexuality as an acceptable alternative lifestyle. Additionally, although Scarbrough did not know of or consent to the News-Sentinel article prior to publication, the Board members believed that the article called Scarbrough's judgment into question, undermined public confidence in him, and impaired his ability to function effectively as chief administrator of the school system.

The Board interviewed the five candidates between May 15 and May 30. It subsequently narrowed the field from five candidates to three, of which David Freels was the third choice. Scarbrough was the Board's fourth choice out of five candidates. After the first and second choices withdrew from consideration, the Board selected Freels as the new Director of Schools, effective September 1, 2000. Consequently, Scarbrough submitted an application for retirement.

Scarbrough alleged that after the publication of the News-Sentinel article, the attitudes of defendant Board members changed and another, less-qualified candidate (Freels) was selected over

him for Director of Schools. Scarbrough brought this action pursuant to 42 U.S.C. § 1983 and Article I §§ 3, 4, 8 and 19 of the Tennessee Constitution for violations of his rights to freedom of speech, association, and exercise of religion, and to equal protection of the laws. The district court granted summary judgment in favor of defendants on all claims.

## Standard of Review

We review a district court's grant of summary judgment *de novo*. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" as to an essential element of the non-moving party's case. Fed. R. Civ. P. 56(c). Where there are no disputed facts, we determine, *de novo*, whether the district court properly applied the substantive law. *See Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1345 (6th Cir. 1992).

## II. DISCUSSION

Scarbrough claims that the Board violated his rights to freedom of speech, association, and religion as guaranteed by the First Amendment, and deprived him of equal protection of the law as guaranteed by the Fourteenth Amendment. Specifically, he claims that when the Board denied him the position of Director of Schools, it was retaliating against him for exercising his First Amendment freedoms and treating him differently than similarly situated applicants based only upon their animus toward homosexuals.

### A. First Amendment Retaliation

Scarbrough first complains that he was deprived of a government employment opportunity in retaliation for his exercise of First Amendment protected activities. Specifically, he alleges that the Board selected Freels over him for Director of Schools because of his tentative agreement to speak at the Metro convention.

In order for an employee to establish a claim of First Amendment retaliation, the employee must demonstrate that: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two - - that is, the adverse action was motivated at least in part by his protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). Thus, in the instant case, the dispositive question is whether Scarbrough's protected conduct caused the Board not to choose him for the position.

### 1. Freedom of Speech

The First Amendment prohibits retaliation by a public employer against an employee on the basis of certain instances of protected speech by the employee. *See Connick v. Myers*, 461 U.S. 138, 142 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 574 (1968). However, "[w]hile public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (internal citations omitted). Thus, courts apply a two-part inquiry for discerning when the discharge of a public employee violates the First Amendment. *See Rose v. Stephens*, 291 F.3d 917, 920 (6th Cir. 2002). "The threshold question is whether the employee's 'speech may be fairly characterized as constituting speech on a matter of public concern.'" *Id.* (quoting *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995)). "If the speech relates to a matter of public concern, then the court employs the balancing test outlined in *Pickering*

*v. Board of Education*, 391 U.S. 563 (1968), to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer." *Id.* This sort of balancing test recognizes the tension that sometimes arises in guaranteeing First Amendment protection to "citizens" who are linked to the government.

In *Pickering*, the Court held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education's allocation of school funds between athletics and education and its methods of informing taxpayers of the need for additional revenue. Regarding the Board's assertion that the letter was detrimental to the operation of the schools, the court stated that:

> [T]he only way in which the Board could conclude, absent any evidence of the actual effect of the letter, that the statements contained therein were per se detrimental to the interest of the schools was to equate the Board members' own interests with that of the schools. Certainly an accusation that too much money is being spent on athletics . . . cannot reasonably be regarded as per se detrimental to the district's schools. Such an accusation reflects rather a difference of opinion between Pickering and the Board as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public interest.

*Id.* at 571. After recognizing the "public interest in having free and unhindered debate on matters of public importance," the Court held that "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 573-74.

Cases following *Pickering* also involved protecting speech on matters of public concern. *See Connick*, 461 U.S. at 144. *Pickering* and its progeny emphasized the right of a public employee "as a citizen, in commenting upon matters of public concern." *See Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 414 (1979); *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 277, 284 (1977); and *Perry v. Sindermann*, 408 U.S. 593, 598 (1972). To this end, the Court announced in *Connick*, 461 U.S. at 147, that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick* erected a dichotomy between citizens speaking on matters of public concern and employees speaking on matters only of personal interest, and laid out the analysis for both. An initial challenge before us is placing the instant case in one of the two categories, where the facts do not yield an apparent classification.

We disagree with the conclusion of the district court that no speech occurred here. Scarbrough agreed to pray or speak before the Metro congregation. The Knoxville News-Sentinel and others reacted as though Scarbrough was going to make or did make the speech in question. Therefore, we will proceed to analyze Scarbrough's case under the traditional tests.

A threshold question that must be answered is whether Scarbrough's intended speech touched on a matter of public concern. Matters of public concern include speech that relates to any matter of political, social, or other concern to the community. *Rankin v. McPherson*, 483 U.S. 378, 383 (1987); *see also Connick*, 461 U.S. at 146 (noting that when "employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices"). Speech made to a public audience, outside the workplace, and involving content largely unrelated to government employment indicates that the employee speaks as a citizen, not as an employee, and speaks on a matter of public concern. *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 466

(1995).[1] "[W]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. Moreover, the entire speech does not have to address matters of public concern, as long as some portion of the speech does so." *Farhat*, 370 F.3d at 589 (quoting *Connick*, 461 U.S. at 147-49) (internal quotation marks omitted).

While Scarbrough's intended speech eludes easy categorization, we conclude that it did touch on a matter of public concern, given its content, form, and context. Although it perhaps would not have fallen within the line of cases primarily addressing speech of government employees on matters relating to their employment, *see, e.g., Connick*, 461 U.S. at 138, *Givhan*, 439 U.S. at 410, and *Pickering*, 391 U.S. at 563, it would have fallen within the line of cases involving speech unrelated to government employment and made on an employee's own time. In *National Treasury Employees' Union*, 513 U.S. at 470, the Supreme Court held that the government cannot prohibit federal employees from receiving compensation for writing and speaking about matters not related to their employment. There, as here, the "vast majority of the speech at issue . . . does not involve the subject matter of Government employment and takes place outside the workplace." *Id.* Scarbrough's intended prayer or speech before the Metro congregation did not take place at his office or relate to his work with the Morgan County Schools in any way, nor did his intended appearance before that conference. Instead, his speech concerned religion and perhaps homosexuality, and was to occur on his own free time, much like the speech at issue in *National Treasury Employees' Union*. Moreover, there is precedent for recognizing that "certain private remarks . . . touch on matters of public concern and should thus be subject to *Pickering* balancing." *San Diego v. Roe*, 543 U.S. 77, 84 (2004) (citing *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987), in which the Supreme Court found a clerical employee wrongly dismissed for remarking, after hearing of an attempt on the life of the United States President, "If they go for him again, I hope they get him").

## 2. *Pickering* Balancing

Because Scarbrough's intended speech on his religious views and on homosexuality are matters of public concern, we will apply the *Pickering* balancing test to Scarbrough's speech to discern whether his interest in engaging in such speech outweighs the Board's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

In performing the *Pickering* balancing test, the speech will not be considered "in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin*, 483 U.S. at 388. Pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* (citing *Pickering*, 391 U.S. at 570-73); *see also Rodgers*, 344 F.3d at 601. Speech and conduct that occur outside the office walls and that do not relate to work interfere less with office efficiency than conduct that occurs inside the office or that relates to the employee's work. *See Connick*, 461 U.S. at 153 (noting that because speech occurred at work it interfered more than the speech at issue in *Pickering*).

Scarbrough's interest in sharing his religious beliefs with the Metro congregation and the community at large is protected conduct. His intended speech did not occur at work or during work

---

[1] *But see United States Civil Serv. v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 567 (1973), which upheld the application of the Hatch Act against postal carriers prohibiting them from engaging in "an active part in political management or in political campaigns" and accordingly restricted the employees not merely while on the job but also while away from work and on their own time.

hours; it was to occur before the religious convention. His meetings regarding the convention also took place outside the office. Moreover, his conduct and intended speech did not relate to his employment in any way. As he clarified in a newspaper interview, he "didn't do it as a Morgan County Superintendent of Schools but as an individual and friend of the man who invited him."

The Board's primary contention with Scarbrough's speech is that it "[had] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[d] the performance of the speaker's duties or interfere[d] with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. Some Board members claim that Scarbrough's agreement to speak at the Metro convention created an atmosphere in which work would be difficult. They insist that neither they, the Board, nor the Morgan County community condone homosexuality, and, thus, both the Board and the community disagree with Scarbrough's decision to speak at the convention and with his religious beliefs, which counsel him to share his faith with others and to embrace those individuals whose lifestyles may diverge from his own. This disagreement aroused tensions between the Board and Scarbrough, which led to an inefficient work atmosphere. However, this line of argument reveals that the detrimental impact on the work environment results directly from Scarbrough's intended speech and his religious beliefs. It would contravene the intent of the First Amendment to permit the Board effectively to terminate Scarbrough for his speech and religious beliefs in this way. Thus, the issue for the finder of fact is whether the protected conduct was the cause of the Board's refusal to hire Scarbrough.

There is, however, a narrow band of speech that is not constitutionally protected even if it relates to a matter of public concern and outweighs the government's interest in efficiency. In *Rose v. Stephens*, 291 F.3d 917 (6th Cir. 2002), we held that "where a confidential or policymaking public employee is discharged on the basis of speech related to his political or policy views, the *Pickering* balance favors the government as a matter of law." *Id.* at 921 (adopting the so-called *Elrod/Branti* exception, which permits termination of public employees in policymaking or other confidential positions based solely on their political affiliation without violating the First Amendment). In creating this exception to what would otherwise constitute First Amendment violations, the *Rose* court emphasized that the exception was based on protecting the interests of the government in situations where "loyalty by [] employees is an essential requirement for the efficient functioning of the workplace." *Id.* at 923.

The concerns expressed in *Rose* are not applicable to the case at hand. Certainly Scarbrough's expression does not directly implicate the loyalty requirements of his position and would unfairly be characterized as insubordination. Although the position of Director of Schools is a policymaking position, as state law delegates discretion to the Director, Scarbrough's speech and conduct do not implicate either his political position or his substantive policy views.

Furthermore, Scarbrough adequately demonstrated the existence of a genuine issue of material fact that renders summary judgment for Board members Strand, Spurling and Lively improper. There is sufficient evidence on the record to allow a reasonable jury to conclude that but for Scarbrough's protected expression, Strand, Spurling and Lively would have voted for him and not Freels. Kay Johnson said in an affidavit that Strand, Spurling and Lively told her that they would not vote for Scarbrough because of his association with homosexuals. Johnson alleged that Strand told her, "'I just can't support him going up there. . . [to] that Church up there for them gay people.'" She further alleged that Spurling stated that "he could not vote for a man who would pray or speak in a place where gay people were present," and Lively stated "that she and Scarbrough 'agreed on almost everything,'" but that she could not vote for a person who associated with gay people. Similarly, Scarbrough stated in his deposition that before Strand and Spurling learned of his views they both informed him that they would vote for him and that they did not like Freels. He also stated that Spurling told him that Lively and Harlan might vote for him. In the final Board vote, after learning of Scarbrough's views, both Strand and Spurling voted against him.

There is also substantial evidence that Spurling and Strand treated Scarbrough differently after learning that Scarbrough believed associating with homosexuals was not immoral or improper. More specifically, Scarbrough testified at his deposition that after Strand learned of his views, he stopped speaking with Scarbrough. He further testified that Spurling stopped dropping by his office in the mornings. Additionally, Board member Ruppe stated in her deposition that she noticed both Strand and Spurling treated Scarbrough differently after they learned of his views.

The Board argues that because Strand voted for Scarbrough in a preliminary vote on May 30, after learning of Scarbrough's views, Strand clearly did not vote against Scarbrough in the final vote based on these views. However, the record suggests that a genuine issue of material fact exists as to Strand's motivation. First, on May 30, Strand had the opportunity to vote for three candidates, the third of whom was Scarbrough. At the final vote, only David Freels was considered. Thus, his vote for Scarbrough does not evidence an intent to support Scarbrough over Freels. In fact, one could argue that the order of his votes evidences the opposite, although it is unclear that the order of the votes had any meaning. Even if Strand had voted for Scarbrough "over Freels" at the May 30 vote, it does not mean that he did not change his mind before the final vote based on Scarbrough's speech. In light of the apparent local controversy and Strand's opposition to homosexuality, this is not an unreasonable inference. Therefore, the May 30 vote is not dispositive but simply evidence for a jury to consider against Scarbrough's claim.

A genuine issue of material fact exists with respect to Lively's motivation. She testified that she never supported Scarbrough and Scarbrough admitted that he did not expect Lively to support him on May 30, but Johnson's affidavit is sufficient to raise a genuine issue of fact. Scarbrough's only other evidence that Lively would have voted for him if he had not exercised his First Amendment rights is from an affidavit from Patricia Jones, who worked with Lively, stating that prior to the Knoxville News-Sentinel article, Lively never spoke against Scarbrough. However, that is proof of nothing.

The district court properly dismissed Scarbrough's First Amendment claims against Harlan. The only evidence Scarbrough submitted to show that Harlan voted against Scarbrough based on Scarbrough's protected expression is that Harlan believed homosexuality to be immoral and disagreed with Scarbrough's decision to associate with homosexuals. There is no evidence that Harlan was ever going to vote for Scarbrough, and Harlan testified that even absent Scarbrough's conduct he would not have voted for Scarbrough. Harlan's beliefs about homosexuality, without more, are insufficient to allow a jury to determine that Harlan voted against Scarbrough based on such beliefs.

We thus reverse the district court's grant of summary judgment on Scarbrough's First Amendment retaliation claim as to Strand, Spurling and Lively and affirm the district court's grant of summary judgment as to Harlan.

### 3. Freedom of Association and Free Exercise of Religion

Scarbrough claims that the Board's actions, in addition to violating his First Amendment right to freedom of speech, violate his rights to freedom of association and the free exercise of religion. "Because the analytic tools for adjudicating First Amendment retaliation claims under the Free Speech Clause have been so extensively developed, courts in this and other circuits have tended to import fully that reasoning when litigants have characterized their claims as arising under another First Amendment clause." *Thaddeus-X*, 175 F.3d at 390. Accordingly, Scarbrough's free exercise and association claims should be analyzed under the First Amendment analysis discussed above and dismissed insofar as Scarbrough construes them as independent claims.

### 4. Equal Protection

Scarbrough also contends that the Board violated the Equal Protection Clause in failing to rehire him as Director of Schools. He claims a violation first because the Board allegedly was motivated by "animus," or involved a discriminatory classification, and second because the Board's adverse action allegedly was based upon Scarbrough's exercise of his First Amendment rights.

The Equal Protection Clause prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. CONST. Am. XIV, § 1. The Clause embodies the principle that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Fundamentally, the Clause protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights. The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers.

The Board is not subject to strict scrutiny because its conduct neither infringes on a class of people's fundamental rights nor targets a member of a suspect class. First, Scarbrough's pleadings and the evidence adduced in discovery indicate that only he was deprived of his fundamental right to associate. The Supreme Court has only applied strict scrutiny to equal protection claims where the plaintiff alleges that the government infringes on the fundamental right of a class of people. *See Zablocki v. Redhail*, 434 U.S. 374, 383, 388 (1978) (striking down a statute that required the class of persons "having minor issue not in [their] custody and which [they are] under obligation to support by any court order or judgment" to obtain a court order before marrying on the ground that it deprived a class of persons of the fundamental right to marry). While we recognize that some equal protection claims involve a "class of one," *see Village of Willbrook v. Olech*, 528 U.S. 562, 564 (2000), we decline to extend the fundamental rights analysis to classes of one. To so extend the fundamental rights analysis would allow the Equal Protection Clause to render other constitutional provisions superfluous. In this case, Scarbrough's right to associate is adequately protected by the First Amendment. In other cases, fundamental rights are protected by the substantive components of the Due Process Clause. Second, he is not a member of a protected class. Inasmuch as homosexuality is not a suspect class in this circuit, we cannot hold that persons who associate with homosexuals constitute a suspect class. *See Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 292-94 (6th Cir. 1997) (discussing *Romer v. Evans*, 517 U.S. 620 (1996)).

Nonetheless, we still review the conduct of the Board members for rationality. Under the rational basis test, Scarbrough has both stated a claim for relief and offered sufficient evidence to survive summary judgment. He alleged that he was treated disparately as compared to Freels, and, thus, the decision to appoint Freels is subject to rational basis review. Under this test, a government action is considered irrational only if it is "unrelated to the achievement of any combination of the legitimate purposes." *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005). "The desire to effectuate one's animus against homosexuals [,however,] can never be a legitimate governmental purpose, [and] a state action based on that animus alone violates the Equal Protection Clause." *Stemler v. City of Florence*, 126 F.3d 856, 873-74 (6th Cir. 1997). A "plaintiff may demonstrate that the government action lacks a rational basis . . . either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren*, 411 F.3d at 71. In this case, Scarbrough has offered sufficient evidence to create a genuine issue of material fact as to whether Lively, Strand and Spurling were motivated by animus against homosexuals.

### 5. Section 1983 Liability of the Morgan County Board of Education

A governmental entity, such as the Board in this case, can be held liable under § 1983 only if a plaintiff establishes "an unconstitutional action that 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers . . . ." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir. 2003) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). On its face, however, the Board's decision to hire Freels over Scarbrough evidences no improper motivation; thus, in order to hold the Board liable Scarbrough must prove that the Board acted out of a constitutionally impermissible motive. *Hull v. Cuyahoga Valley Bd. of Educ.*, 926 F.2d 505, 515-16 (6th Cir. 1991).

The district court held that the Board could not be held liable under § 1983 because Scarbrough failed to prove that a *majority* of the Board acted with an improper motive in selecting Freels over him. The district court noted that two members of the Board remained Scarbrough's staunch allies throughout the appointment process, and two Board members had long-standing opposition to Scarbrough, irrespective of his tentative agreement to speak at the convention. The evidence, viewed in a light most favorable to Scarbrough, revealed only that his relationships with the remaining two Board members, Spurling and Strand, with a possibility for Lively, changed in the wake of the article's publication. Accordingly, the district court denied Scarbrough any relief against the Board.

Scarbrough seeks to hold the Board liable as a governmental entity and not only it members in their individual capacities. The Board can only be liable for its members' actions where those members have final authority to establish municipal policy. *City of St. Louis v. Proprotnik*, 485 U.S. 112, 127-28 (1988); *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). Even a single action can be official municipal policy, as long as the decisionmaker acts with a governmental authority. *Pembauer v. Cincinnati*, 475 U.S. 469, 480 (1986). The Board does not dispute that its members have sufficient authority.

Scarbrough must still show, however, that his protected conduct was a substantial factor in the Board's decision, and not just in the votes of certain members. He has the initial burden of demonstrating that his protected conduct motivated the Board to take adverse employment action. The burden then shifts to the Board to demonstrate that it would have taken the same action absent the proper motive. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Circuits are split on how to determine if a board, rather than its members, acts with improper motive. The Second, Third, and Ninth Circuits have implied that a board is liable for actions that it would not have taken "but for" members acting with improper motive. *See Laverdure v. County of Montgomery*, 342 F.3d 123, 125 (3d Cir. 2003) (no municipal liability because board voted unanimously and only one member had improper motive); *Jeffries v. Halston*, 52 F.3d 9, 14 (2d Cir. 1995) ("[T]he nine votes based on legitimate grounds constitute a superseding cause breaking the causal chain between the tainted motives . . . and the decision"); *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir. 1994) (no municipal liability because board acted unanimously and only one member had improper motive). Thus, where improperly motivated members supply the deciding margin, the board itself is liable.

We decline to follow the approach suggested by Scarbrough from *Scott-Harris v. City of Fall River*, 134 F.3d 427, 437 (1st Cir. 1997), rev'd on other grounds *sub nom. Bogan v. Scott-Harris*, 523 U.S. 44 (1998). In that case, board liability only existed where the plaintiff established both: "(a) bad motive on the part of at least a significant block of legislators, and (b) circumstances suggesting the probable complicity of others." *Id.* That approach would be difficult to apply, because it leaves many questions unanswered. Among the most important of these is what

constitutes a "significant bloc of legislators" or "circumstances suggesting the probable complicity of others."

The "but for" approach from the Second, Third and Ninth Circuit cases is more in accord with the decision from *Mt. Healthy*. In that case, the Court set up a burden-shifting regime in which a key question was whether a board would have acted the same way, absent improper motive.

Applying the "but for" approach here, Scarbrough has submitted enough evidence to hold the Board itself liable. He has submitted evidence showing Lively, Strand and Spurling voted with improper motivation. The Board would not have taken the action it did were it not for their votes. Thus, the Board is not entitled to summary judgment on this issue.

### 6. The Board Members' Qualified Immunity from Scarbrough's First Amendment Retaliation Claim

Under the doctrine of qualified immunity, "'government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would know.'" *Hager v. Pike County Bd. of Educ.*, 286 F.3d 366, 371 (6th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, determining whether qualified immunity shields a defendant involves a two-part inquiry. *Id.* First, a court must ask whether the plaintiff suffered a violation of his constitutional rights. *Id.* Second, the court must ask if the constitutional right in question was a clearly established constitutional right of which a reasonable person would know. *Id.* As discussed above, Scarbrough has a constitutional right to express his religious beliefs without being subjected to adverse action on account of his expression. Thus, whether the Board members are entitled to qualified immunity hinges on whether Scarbrough's right was clearly established such that a reasonable person would know that the alleged decision to hire Freels violated Scarbrough's right.

We throughly addressed whether an employee's First Amendment right to be free of retaliation is clearly established in *Williams v. Kentucky*, 24 F.3d 1526, 1533-38 (6th Cir. 1994). We noted that in free speech cases, the employee's right to speak must be "so clear at the time in question that reasonable minds could not differ on the constitutionality." *Id.* at 1534. We acknowledged that because *Pickering* and *Connick* require courts to balance competing interests to determine if an employee's speech is protected, "in many public employee free speech cases it would be unclear to a reasonable official what the outcome of the balancing inquiry should be." *Id.* at 1537. However, the greater the speech's relationship to a matter of public concern and the more minimal the effect on office efficiency the more likely a reasonable person would be to understand that the employer's actions violated the Constitution. *Id.* Here, Scarbrough's right to express himself was clearly established, and thus, the Board members are not entitled to qualified immunity.

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court granting summary judgment to the Board, Strand, Spurling and Lively on Scarbrough's First Amendment retaliation, § 1983 claim, and affording Defendants qualified immunity, and **AFFIRM** the judgment of the district court granting summary judgment in favor of Defendants on Scarbrough's free exercise and association claims, and his equal protection claim and the grant of summary judgment for Harlan on the § 1983 claim. This case is **REMANDED** for further proceedings consistent with this opinion, against the Board and Strand, Spurling, and Lively individually.